**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| David Isabel, | No. CV-18-03217-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Michele Reagan, et al., | |
| Defendants. | |

## INTRODUCTION

In February 2016, Arizona's Secretary of State, Defendant Michele Reagan ("the Secretary"), published the State's calendar for the 2016 election cycle. This calendar identified Monday, October 10, 2016—Columbus Day—as the voter registration deadline for the 2016 general election ("the 2016 Election").

Plaintiff David Isabel ("Isabel"), who moved to Arizona from New York in early October 2016, registered to vote at the Arizona Department of Motor Vehicles ("DMV") on October 11, 2016. Because this registration effort occurred one day after the registration deadline the Secretary had previously set, Isabel was only allowed to cast a provisional ballot during the 2016 Election, which ultimately wasn't counted by officials within the Maricopa County Recorder's Office.

Isabel has now sued the Secretary, as well as Maricopa County Recorder Adrian Fontes and Maricopa County (collectively, "the County Defendants"), arguing that the Secretary and the County Defendants violated two federal election statutes as well as

Article I, Section 2 of the United States Constitution. The first statute invoked by Isabel is the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20501 *et seq.*, which requires each state's voter registration deadline to be "not later" than 30 days before the election date. Isabel contends that, because October 10, 2016 was a holiday that fell on a Monday—meaning that post offices and the DMV were closed on that date, as well as the preceding Sunday—Arizonans wishing to register via the mail or at the DMV were effectively required to register at least 31 days before the 2016 Election, in violation of the NVRA's 30-day limit. The other statute invoked by Isabel is the Help America Vote Act of 2002 ("HAVA"), 52 U.S.C. § 21081 *et seq.*, which requires state election officials to count provisional ballots if the officials "determine[] that the individual [who cast the provisional ballot] is eligible under State law to vote." Isabel contends the HAVA was violated when his provisional ballot wasn't counted.

Notably, Isabel seeks to utilize 42 U.S.C. § 1983 as a vehicle for asserting claims based upon the NVRA and the HAVA (as well as for the alleged violation of Article I, Section 2 of the Constitution). As a remedy, Isabel seeks "compensatory and punitive damages," among other things.

Now pending before the Court are the County Defendants' motion to dismiss for lack of subject-matter jurisdiction (Doc. 32) and the Secretary's motion to dismiss for failure to state a claim (Doc. 33). The motions are fully briefed and the Court heard oral argument on June 5, 2019. For the following reasons, the Court will deny the County Defendants' motion and grant the Secretary's motion.

## BACKGROUND

I.   Factual History

### A.   Voter Registration Deadline

The facts alleged in the complaint, which the Court assumes to be true for purposes of ruling on the pending motions, are as follows. To be eligible to vote in a particular election, Arizona law requires that a voter's registration form be "received by the county recorder . . . prior to midnight of the twenty-ninth day" before that election. (Doc. 1 ¶ 13.)

The twenty-ninth day before the 2016 Election was Monday, October 10. (*Id.* ¶ 16.) It was also Columbus Day—a state and federal holiday. (*Id.* ¶¶ 15, 16.) Post offices were closed on Sunday, October 9 and Monday, October 10. (*Id.* ¶ 17.) The DMV was closed on Saturday, October 8, Sunday, October 9, and Monday, October 10. (*Id.* ¶ 18.)

The Secretary set the voter registration deadline for the 2016 Election as Monday, October 10. (*Id.* ¶ 19.) The Secretary and the County Defendants adopted a policy that deemed invalid any ballot cast in the 2016 Election by a voter who registered on October 11, 2016. (*Id.* ¶¶ 22, 23.) More than 2,000 Arizonans registered to vote on October 11, 2016, including Isabel. (*Id.* ¶ 24.)

**B.     Prior Lawsuit To Enjoin the Secretary From Implementing Deadline**

On October 19, 2016, the Arizona Democratic Party and the Democratic National Committee filed a lawsuit against the Secretary, seeking, among other relief, a temporary restraining order to enjoin her from "disqualifying any Arizona voter from voting a regular ballot in the November 8 Election solely because he or she did not register by October 10, 2016, if he or she submitted a valid voter registration application before midnight on October 11, 2016 and is otherwise eligible to vote." Complaint at 10, *Arizona Democratic Party v. Reagan*, 16-cv-03618 (D. Ariz. 2016.)[1]

On November 3, 2016, the Hon. Steven P. Logan issued an order denying the request for emergency injunctive relief. Although Judge Logan agreed with the plaintiffs that the Secretary violated the NVRA by setting the voter registration deadline on Columbus Day, Judge Logan concluded the plaintiffs' "delay in initiating this action, and the resulting prejudice that has arisen due to that delay, precludes relief." *Arizona Democratic Party v. Reagan*, 2016 WL 6523427, *16 (D. Ariz. 2016). As a result, Judge Logan didn't require the votes of those who registered on October 11 to be counted. *Id.* at 18.

---

[1]     Although Isabel didn't plead this fact, the Court may take judicial notice of "proceedings in other courts . . . within . . . the federal judicial system." *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (citation omitted).

**C.    Failure To Count Isabel's Vote**

On November 8, 2016, Isabel went to his assigned polling location to cast his ballot. (Doc. 1 ¶ 35.)  Isabel was instructed to complete a provisional ballot because he wasn't on the list of eligible voters.  (*Id.*)  Isabel's provisional ballot was verified by the County Defendants but not counted because he had registered on October 11.  (*Id.* ¶¶ 36, 37.)

On or about November 28, 2016, the County Defendants certified the 2016 General Election Official Canvass.  (*Id.* ¶ 39.)  On or about December 5, 2016, the Secretary instructed the Assistant Secretary of State to serve as the Acting Secretary of State and certify the 2016 General Election Official Canvass.  (*Id.* ¶ 40.)  The Secretary signed the 2016 General Election Official Canvass Certification as both the Secretary of State and the Acting Governor.  (*Id.* ¶ 41.)

In 2017, Isabel first learned that his ballot had not been counted.  (*Id.* ¶ 43.)

II.    Procedural History

On October 9, 2018, Isabel filed his complaint in this action.  (Doc. 1.)

On November 27, 2018, the County Defendants filed a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1).  (Doc. 32.)

On November 30, 2018, the Secretary filed a motion to dismiss for failure to state a claim under Rule 12(b)(6).  (Doc. 33.)

**DISCUSSION**

I.    The County Defendants' Motion To Dismiss

The County Defendants' motion identifies five reasons why the Court lacks subject-matter jurisdiction over Isabel's claims.  First, the County Defendants assert that Isabel lacks standing because his injury (not having his vote counted in the 2016 Election) isn't "fairly traceable" to their conduct and isn't redressable by the Court.  (Doc. 32 at 4-7.)  Second, they argue the Arizona Legislature's passage of Senate Bill 1307—which ensures no future voter registration deadlines will fall on a weekend or holiday—moots Isabel's claims, as does the doctrine of laches.  (*Id.* at 7-12.)  Third, they contend Isabel's claims against them are "improper because recorders are not empowered to establish statewide

voter registration deadlines." (*Id.* at 13.)  Fourth, they argue Isabel's NVRA-based claim is barred because he didn't follow the statute's notice procedures before bringing this lawsuit.  (*Id.* at 13-14.)  And fifth, they assert Isabel is barred from bringing a HAVA-based claim because he failed to exhaust administrative remedies.  (*Id.* at 14-15.).[2] However, during the oral argument on June 5, 2019, the County Defendants conceded that their second argument (mootness/laches) lacks merit and withdrew their fifth argument (exhaustion under the HAVA).  Accordingly, the Court will only address their first, third, and fourth arguments below.

A.  **Standing**

Article III of the Constitution limits the judicial power of the United States to the resolution of cases and controversies.  "[O]ne of the controlling elements in the definition of a case or controversy under Article III is standing.  The requisite elements of Article III standing are well established: A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Hein v. Freedom from Religion Foundation, Inc.*, 551 U.S. 587, 598 (2007) (citations and internal quotation marks omitted).  To be "fairly traceable," the injury cannot "result from the independent action of some third party not before the court." *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 42 (1976).

1.  *"Fairly Traceable"*

The County Defendants ask the Court to dismiss this action because the injury suffered by Isabel—the failure to count his vote in the 2016 Election—isn't "fairly traceable" to them.  They contend that, although they "tallied the ballots in the 2016 General Election, [they] did not set the voter registration deadline," which was set by the Secretary. (Doc. 32 at 6.)  They further contend they were required to abide by this deadline by the threat of criminal penalties.  (*Id.*)  They conclude that Isabel's injury was therefore

---

[2]  The County Defendants make a sixth argument that "punitive damages are wholly inappropriate." (*Id.* at 16.)  However, this argument is predicated on their argument that Isabel failed to exhaust his administrative remedies under the HAVA.  Because the County Defendants have now withdrawn their HAVA exhaustion argument, the Court doesn't address the availability of punitive damages.

either caused by the Secretary (who set the deadline) or by Isabel himself (who failed to register in time).  (*Id.*)

Isabel, in response, contends his injury is directly traceable to the County Defendants because "the County adopted and implemented a policy that deemed invalid any ballot cast in the November 2016 Election by a voter who registered on October 11, 2016."  (Doc. 36 at 6.)  As for "the-Secretary-made-us-do-it defense," Isabel argues the County Defendants are confusing comparative fault with traceability.  (*Id.* at 6-7.)

The County Defendants dedicate their entire reply to their traceability argument. (Doc. 39.)  They cite *Kurtz v. Baker*, 829 F.2d 1133 (D.C. Cir. 1987), for the proposition that "a defendant's action cannot cause a plaintiff's alleged injury if the defendant has no authority or power to act."  (Doc. 39 at 3.)

The County Defendants are not entitled to dismissal based on a lack of traceability. The Ninth Circuit has held that the "Article III causation threshold" is "less rigorous" than proximate causation.  *Canyon Cty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 974 n.7 (9th Cir. 2008); *see also Rothstein v. UBS AG,* 708 F.3d 82, 92 (2d Cir. 2013) ("[T]he test for whether a complaint shows the 'fairly traceable' element of Article III standing imposes a standard lower than proximate cause.").  Thus, "[t]o survive a motion to dismiss for lack of constitutional standing," plaintiffs need only "establish a 'line of causation' between defendants' action and their alleged harm that is more than 'attenuated.'  A causal chain does not fail simply because it has several 'links,' provided those links are 'not hypothetical or tenuous' and remain 'plausib[le].'"  *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) (citations omitted).  Put another way, a plaintiff need not allege that a defendant was "the sole source of" its injury and "need not eliminate any other contributing causes to establish its standing."  *Barnum Timber Co. v. U.S. E.P.A.*, 633 F.3d 894, 901 (9th Cir. 2011).

Here, Isabel alleges the County Defendants implemented the policy that resulted in his provisional ballot being disregarded.  This is sufficient to show that Isabel's asserted injury is "fairly traceable" to the County Defendants' conduct, because it places the County

Defendants in the "line of causation" that ultimately resulted in his injury. *Maya*, 658 F.3d at 1070. Although the County Defendants' conduct wasn't the only cause of his injury—it was the Secretary who established the October 10 voter registration deadline—it was a cause. *Barnum Timber*, 633 F.3d at 901 (a plaintiff "need not eliminate other contributing causes to establish its standing").

*Kurtz* is not to the contrary. There, "an advocate of 'secular humanism'" sued the chaplains of the United States Senate and House of Representatives after his request to make a non-religious speech to Congress about moral responsibility was denied. 829 F.2d at 1134-35. The D.C. Circuit concluded the plaintiff lacked standing to assert such a claim because the chaplains didn't have the authority or discretion to approve such speaking requests—"the opportunity to address either house is a privilege rarely extended to outsiders, and then only with the approval of the members of the respective houses." *Id.* at 1142. In other words, the *Kurtz* court concluded the plaintiff couldn't establish traceability because he'd sued the wrong people. Moreover, the *Kurtz* court noted the plaintiff would have been able to establish traceability if there had been "a directive from the House or the Senate that their chaplains not admit Kurtz to the benefits otherwise available to him," *id.* at 1144, or if "the chaplains were implementing an unconstitutional directive from their superiors," *id.* at 1145. That, of course, is exactly the situation here—Isabel faults the County Defendants for enforcing and implementing the Secretary's allegedly unconstitutional directives.

## 2. *Redressability*

The County Defendants next argue Isabel's injury isn't redressable because "there is no court decision that can require Defendants to retroactively count Plaintiff's ballot cast in the 2016 general election." (Doc. 32 at 7.)

This argument is premised on a misconception that Isabel is seeking injunctive relief. To be clear, Isabel only seeks monetary relief in this case. (Doc. 1 at 15.) The Supreme Court has repeatedly held "that actions for damages may be maintained for wrongful deprivations of the right to vote." *Carey v. Piphus*, 435 U.S. 247, 265 n.22 (1978)

1  (collecting cases).  Therefore, the County Defendants' redressability argument is without

2  merit.

3         **B.**     **Power Of County Recorders**

4         The County Defendants argue Count 1 is improper because "recorders are not

5  empowered to establish statewide voter registration deadlines."  (Doc. 32 at 13.)  Rather,

6  "the Secretary sets the voter registration deadline."  (*Id.*)

7         This argument merely repackages the County Defendants' standing argument

8  regarding traceability, which the Court rejected above.

9         **C.**     **Failure To Provide Notice Under The NVRA**

10        The County Defendants also argue Count 1 is improper because a prerequisite to

11 filing suit under the NVRA is "pre-suit notice to the chief election official of the State (i.e.

12 Secretary of State)."  (Doc. 32 at 13.)

13        This argument lacks merit.  The NVRA provides that an "aggrieved person need not

14 provide notice" before bringing a civil action if "the violation occurred within 30 days

15 before the date of an election for Federal office."  52 U.S.C. § 20510(b)(3).  Here, Isabel

16 alleges he registered to vote on October 11, 2016 (Doc. 1 ¶ 24)—28 days before the 2016

17 Election.  Thus, the NVRA wouldn't have required notice under the facts of this case.

18 **II.**    **The Secretary's Motion To Dismiss**

19        The Secretary argues Isabel has failed to state a claim because: (1) Isabel can't assert

20 a violation of the NVRA using § 1983, and even if he could, the NVRA doesn't permit

21 recovery of monetary damages; (2) the HAVA doesn't apply here because Isabel wasn't

22 eligible to vote in the 2016 Election; and (3) Isabel wasn't disenfranchised by the

23 Secretary's voter registration deadline.  (Doc. 33.)

24        **A.**     **Legal Standard**

25        "[T]o survive a motion to dismiss, a party must allege 'sufficient factual matter,

26 accepted as true, to state a claim to relief that is plausible on its face.'"  *In re Fitness

27 Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556

28 U.S. 662, 678 (2009)).  "A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678). "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1144-45 (citation omitted). However, the court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 679-80. The court also may dismiss due to "a lack of a cognizable legal theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

### B.     The NVRA

A brief discussion of the NVRA is helpful before addressing the parties' arguments. The NVRA requires each state to "ensure that any eligible applicant is registered to vote in an election" if the applicant has registered to vote "not later than the lesser of 30 days, or the period provided by State law, before the date of the election." 52 U.S.C. § 20507(a)(1). The statute also identifies four different ways in which a person can register to vote and identifies the date on which each method is deemed effective: (1) submission of a voter registration form to "the appropriate State motor vehicle authority," which is effective upon submission; (2) submission of a voter registration form through the mail, which is effective upon the date it is "postmarked"; (3) in-person registration "at the voter registration agency," which is effective when "accepted"; and (4) submission of a voter registration form to "the appropriate State election official," which is effective when "received." *Id*.

"The NVRA creates a private right of action for '[a] person who is aggrieved by a violation of [the NVRA].'" *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1035 (9th Cir. 2015) (citations omitted). An aggrieved person "may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation." 52 U.S.C. § 20510(b). Here, the crux of the dispute is whether Isabel can assert an NVRA-based claim via 42 U.S.C. § 1983 (instead of suing directly under 52 U.S.C. § 20510(b)) and if so, whether he is permitted to seek compensatory and punitive damages in the § 1983 action.

The Secretary argues that, because the NVRA "outlines a specific remedial scheme

1    providing only declaratory and injunctive relief to aggrieved parties," Isabel can't bring a

2    § 1983 claim and can't seek compensatory damages. (Doc. 33 at 7.) In addition to relying

3    upon the NVRA's text, the Secretary identifies various pieces of legislative history that

4    suggest Congress didn't intend to allow monetary damages for violations of the NVRA.[3]

5    (Doc. 33 at 8.)

6          In response, Isabel makes three arguments. First, he contends there is a presumption

7    that a federal statute is enforceable via § 1983 where it (like the NVRA) creates

8    "enforceable right[s]." (Doc. 37 at 4-5.) Second, he notes that the NVRA contains a

9    "savings clause," which provides that "the rights and remedies established by this section

10   are in addition to all other rights and remedies provided by law." (*Id.* at 6-8.) He contends

11   the Supreme Court, in *Herman & McLean v. Huddleston*, 459 U.S. 375 (1983), "addressed

12   nearly identical savings clauses and held that they evidenced Congress's intent to

13   supplement, not preclude." (*Id.*) Third, he contends the legislative history cited by the

14   Secretary doesn't support her position—it merely states "this section" of the NVRA

15   doesn't authorize "the award of monetary damages" and thus doesn't preclude claims for

16   monetary damages under other provisions, such as § 1983. (*Id.* at 9.)

17         The Court agrees with the Secretary that a plaintiff wishing to assert an NVRA-

18   based claim must sue directly under the NVRA, not via § 1983. As an initial matter, it

19   should be noted that four other courts have addressed this issue. Two of those courts

20   concluded a plaintiff can't assert an NVRA-based claim via § 1983[4] while the other two

---

21   [3]   The Secretary cites H.R. Rep. No. 103-9, at 20 (1993), which states, in part: "The
22   Committee has heard concerns that this section authorizes the award of monetary damages.
     It does not." She also cites S. Rep. No. 103-6, at 36-37 (1993), which states: "It should be
23   noted that this section does not authorize the award of monetary damages. Rather, the civil
     remedies that are authorized are corrective action in the form of declaratory and injunctive
24   relief, plus reasonable attorney fees." (Doc. 33 at 8-9.)

25   [4]   *Assoc. of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 367 n.11 (5th Cir.
     1999) (rejecting plaintiff's contention that "it has standing to pursue its [NVRA] claims
26   under 42 U.S.C. § 1983" in part because "'section 1983 . . . is not an available for
     deprivation of a statutory right when the statute, itself, provides an exclusive remedy for
27   violations of its own terms'") (citations omitted); *Nat'l Coal. of Students with Disabilities
     Educ. & Legal Def. Fund v. Allen*, 961 F. Supp. 129, 132 (E.D. Va. 1997), *reversed on
28   other grounds*, 152 F.3d 283 (4th Cir. 1998) ("NCSD has failed to assert any rights under
     . . . the NVRA to support a cause of action under Section 1983. The NVRA provides a
     detailed method of enforcement which is exclusive, and as a result private persons cannot

- 10 -

reached the opposite conclusion.[5]  These decisions, however, aren't terribly helpful here. Not only are all of them from outside the Ninth Circuit, but all were decided in the 1990s, before the Supreme Court and Ninth Circuit issued a series of decisions (discussed below) clarifying the circumstances under which a plaintiff should be permitted to assert a claim under § 1983 when the underlying statute providing the basis for the § 1983 claim contains its own remedial scheme.

The leading authority on this issue is *City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113 (2005).  There, the Supreme Court began by acknowledging that when a federal statute creates an individual right, a rebuttable presumption arises that the right is enforceable under § 1983.  *Id.* at 120.  However, the Court went on to explain that "[t]he defendant may defeat this presumption by demonstrating that Congress did not intend that remedy for a newly created right."  *Id.* (citations omitted).  Evidence of such congressional intent "may be found directly in the statute creating the right, or inferred from the statute's creation of a 'comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.'"  *Id.* (citations omitted).  The Court further emphasized that "[t]he provision of an express, private means of redress in the statute itself is ordinarily an indication that Congress did not intend to leave open a more expansive remedy under § 1983."  *Id.* at 121.  In other words, "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others."  *Id.* (citation omitted).  Finally, the Court emphasized that "in *all* of the cases in which we have held that § 1983 *is* available for violation of a federal statute, we have emphasized that the statute at issue . . . *did not* provide a private judicial remedy (or, in most of the cases, even a private administrative remedy) for the rights violated."  *Id.* (citations omitted).

---

support a Section 1983 claim based upon an alleged violation of the NVRA.").

[5]      *Condon v. Reno*, 913 F. Supp. 946, 960 (D.S.C. 1995) ("[T]he notice section is a prerequisite to filing a suit directly under the NVRA, but [the NVRA's savings clause] specifically provides that such rights and remedies established in the NVRA do not abrogate other rights, and here the private plaintiffs are also exercising their rights under 42 U.S.C. § 1983 . . . ."); *Assoc. of Cmty. Orgs. for Reform Now v. Miller*, 912 F. Supp. 976, 982 (W.D. Mich. 1995) ("NVRA creates an enforceable right under § 1983 . . . . [T]he statute contains no express provision limiting a plaintiff's remedy for violations of the act to the remedy created by the act.").

The NVRA expressly creates a private right of action for its violation: an aggrieved person may bring a civil action for declaratory or injunctive relief after complying with the applicable notice requirements. *See* 52 U.S.C. § 20510(b). Thus, the NVRA isn't like the statutes for which the Supreme Court has held § 1983 remains available as a remedy.

That isn't to say the inclusion of a private remedy in the NVRA conclusively establishes Congress's intent to prohibit its vindication under § 1983—it doesn't. *Palos Verdes*, 544 U.S. at 122 ("The Government as *amicus*, joined by the City, urges us to hold that the availability of a private judicial remedy is not merely indicative of, but conclusively establishes, a congressional intent to preclude § 1983 relief. We decline to do so."). Rather, "[t]he ordinary inference that the remedy provided in the statute is exclusive can surely be overcome by textual indication, express or implicit, that the remedy is to complement, rather than supplant, § 1983." *Id.*

Here, Isabel argues the inference of exclusivity is overcome by the NVRA's "savings clause," which he contends is a textual indication that Congress intended § 1983 to be an additional mechanism to vindicate a violation of one's rights under the NVRA. That clause provides: "The rights and remedies established by this section are in addition to all other rights and remedies provided by law." 52 U.S.C. § 20510(d).

This argument is unavailing. The savings clause in the NVRA is similar to the savings clauses at issue in *Middlesex County Sewerage Authority v. National Sea Clammers Association*, 453 U.S. 1 (1981), in which the Supreme Court determined that a § 1983 action wasn't available for a violation of the Federal Water Pollution Control Act ("FWPCA") or the Marine Protection, Research, and Sanctuaries Act of 1972 ("MPRSA"). The FWPCA provided: "Nothing in this section shall restrict any right which any person (or class of persons) may have . . . *to seek any other relief* . . . ." *Id.* at 29 (citing 33 U.S.C. § 1365(e)) (emphasis added). Similarly, the MPRSA provided: "The injunctive relief provided by this subsection shall not restrict any right which any person (or class of persons) may have . . . *to seek any other relief* . . . ." *Id.* at 29 (citing 33 U.S.C. § 1415(g)(5)) (emphasis added). The Supreme Court determined that neither statute preserved the

availability of a § 1983 action because "[t]he language of these clauses . . . does not . . . support the view that Congress expressly preserved § 1983 remedies for violations of *these statutes*." *Id.* at 20 n.31. Here, similarly, the NVRA's savings clause doesn't expressly state that plaintiffs wishing to assert NVRA-based claims may do so under § 1983.

*Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983), is easily distinguishable and does not require a different result. There, the Supreme Court held that a plaintiff could bring a claim under Section 10(b) of the Securities Exchange Act of 1934—a provision that didn't include its own express cause of action—even though the challenged conduct would also provide the basis for an action under Section 11 of the Securities Act of 1933, which did create an express private right of action. *Id.* at 382-33. Although the Court stated that this outcome was supported in part by the presence of a savings clause, *id.* at 383-84, the Court also emphasized that "when Congress comprehensively revised the securities laws in 1975, a consistent line of judicial decisions had permitted plaintiffs to sue under Section 10(b) regardless of the availability of express remedies . . . . In light of this well-established judicial interpretation, Congress' decision to leave Section 10(b) intact suggests that Congress ratified the cumulative nature of the Section 10(b) action." *Id.* at 385-86 (citations omitted).

This case does not involve remotely similar circumstances. At the time Congress enacted the NVRA in 1993, it wasn't acting against the backdrop of decades of judicial decisions authorizing plaintiffs to bring § 1983 actions to vindicate the right to register to vote within 30 days of the election. No such right existed until the NVRA was passed. Accordingly, the inclusion of savings clause within the NVRA can't be viewed as a congressional intent to "ratify" this preexisting caselaw. Moreover, *Huddleston* addressed the somewhat unique question of how to harmonize a pair of closely related securities statutes that were enacted within a year of each other. That is an entirely different kettle of fish from the issue presented here—whether Congress intended to make § 1983 damages actions available by including a savings clause in a statute that creates its own statutory right of action with limited remedies. If *Huddleston* had any bearing on that issue, the

Supreme Court surely would have mentioned it in *Palos Verdes*.

Finally, the inference of exclusivity arising from the NVRA's creation of an express judicial remedy is further bolstered by other considerations. In *Palos Verdes*, the Supreme Court determined the statute at issue didn't allow for enforcement via § 1983 because, among other reasons, the statute "limits relief in ways that § 1983 does not." 544 U.S. at 122. The same is true here. The NVRA requires a party to give notice of a violation before bringing a civil action if the federal election is more than 30 days away—§ 1983 does not. Also, the NVRA only allows declaratory and injunctive relief, whereas § 1983 allows a plaintiff to recover monetary damages. Thus, allowing a plaintiff to assert a § 1983 action for money damages to vindicate violations of the NVRA "would distort the scheme of . . . limited remedies created by [the NVRA]" and flip on its head the "assumption . . . that limitations upon the remedy contained in the statute are deliberate and are not to be evaded through § 1983." *Palos Verdes*, 544 U.S. at 123, 127. *See also Stilwell v. City of Williams*, 831 F.3d 1234, 1244 (9th Cir. 2016) ("The *Sea Clammers* line of cases teaches that when Congress creates a right by enacting a statute but at the same time limits enforcement of that right through a specific remedial scheme that is narrower than § 1983, a § 1983 remedy is precluded. This makes sense because the limits on enforcement of the right were part and parcel to its creation.").[6]

Accordingly, Isabel's NVRA claim asserted through § 1983 must be dismissed.[7]

_____

[6] Notably, in the two decisions approving the assertion of NVRA claims via § 1983, the plaintiffs were only seeking injunctive and declaratory relief. *Condon*, 913 F. Supp. at 960 ("[T]heir suit . . . seeks only prospective injunctive relief rather than money damages."); *Miller*, 912 F. Supp. at 988 (after ruling in plaintiffs' favor, ordering the following relief: "Defendants shall comply fully with the NVRA. Within ten (10) days of this Order, defendants shall file and serve a proposed plan for implementing the NVRA. The plan shall specify the date by which defendants will be in full compliance with the NVRA, and shall include copies of defendants' most current voter registration forms."). This provides an additional reason to conclude those decisions don't support Isabel's claim here.

[7] In reaching this conclusion, the Court did not rely upon the legislative history materials proffered by the Secretary. *Epic Sys. Corp. v. Lewis*, 138 S.Ct. 1612, 1631 (2018) ("[L]egislative history is not the law. It is the business of Congress to sum up its own debates in its legislation, and once it enacts a statute [w]e do not inquire what the legislature meant; we ask only what the statute means.") (citations and internal quotation marks omitted).

C. **The HAVA**

The "HAVA was passed in order to alleviate a significant problem voters experience [, which] is to arrive at the polling place believing that they are eligible to vote, and then to be turned away because the election workers cannot find their names on the list of qualified voters." *Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 569 (6th Cir. 2004) (citation omitted). The "HAVA dealt with this problem by creating a system for provisional balloting, that is, a system under which a ballot would be submitted on election day but counted if and only if the person was later determined to have been entitled to vote." *Id.*

The complaint alleges the Secretary violated section 302(a)(4) of the HAVA. (Doc. 1 ¶ 62.) That provision states:

> If the appropriate State or local election official to whom the [provisional] ballot or voter information is transmitted . . . determines that the individual is eligible under State law to vote, the individual's provisional ballot shall be counted as a vote in that election in accordance with State law.

52 U.S.C. § 21082(a)(4). Isabel alleges the Secretary violated that provision because he "should have been eligible to vote under state law," yet the Secretary didn't count his provisional ballot. (Doc. 1 ¶ 63.)

The Secretary argues the HAVA is inapplicable, and thus Count 2 of Isabel's complaint must be dismissed, because Isabel "was not eligible under state law to vote in the 2016 General Election because he failed to timely register." (Doc. 33 at 9.) The Secretary asserts that the "HAVA has not 'supplanted or 'strip[ped] from the States their traditional responsibility to administer elections[,]' including their authority to set voter registration deadlines." (*Id.* at 10.) She contends the deadline to register to vote was set for October 10, regardless of whether it should have been set on October 11 under the NVRA, and thus Isabel failed to timely register. (*Id.*)

In response, Isabel asserts he "was eligible to vote under Arizona law" because when a deadline to perform a function falls on a holiday, "it may be performed on the next ensuing business day with effect as though performed on the appointed day." (Doc. 38 at

10.)  Thus, "the Secretary was required to treat all valid registration forms, including [Isabel's], submitted on October 11th as if they were submitted on October 10th." (*Id.*).

Both parties miss the mark.  "One and only one subsection of [the HAVA] addresses the issue of whether a provisional ballot will be counted." *Fla. Democratic Party v. Hood*, 342 F. Supp. 2d 1073, 1080 (N.D. Fla. 2004).  That subsection—section 302(a)(4)— doesn't require a provisional ballot to be counted if an individual *should have been* deemed eligible to vote by state election officials (as Isabel argues).  Nor does section 302(a)(4) require a provisional ballot to be counted if an individual *actually is* eligible to vote under state law (as the Secretary's argument seemingly suggests).  Rather, section 302(a)(4) requires a provisional ballot to be counted only if the appropriate election official "determines" the individual to be eligible.

Thus, under section 302(a)(4) of the HAVA, Isabel was entitled to have his provisional ballot counted only if a state or local election official determined he was eligible to vote.  Here, Isabel concedes the Secretary determined he was ineligible to vote in the 2016 Election.  (Doc. 1 ¶ 3 ["Defendants improperly deemed [Isabel] ineligible to vote and refused to count his ballot.].)  Thus, Isabel fails to state claim under the HAVA.

This conclusion is compelled by the HAVA's plain language.  After all, the "HAVA is quintessentially about being able to *cast* a provisional ballot." *Sandusky*, 387 F.3d at 576.  In contrast, "[t]he only subsection of the HAVA that addresses the issue of whether a provisional ballot will be counted," section 302(a)(4), "conspicuously leaves that determination to the States." *Id.* at 577.  Because Isabel's dispute is with the *propriety* of the Secretary's determination regarding his eligibility to vote under Arizona state law, the HAVA is not the proper vehicle for asserting his claim. *Sandusky*, 387 F.3d at 578 ("HAVA does not require that any particular ballot, whether provisional or 'regular,' must be counted as valid."); *Ron Barber for Cong. v. Bennett*, 2014 WL 6694451, *8 (D. Ariz. 2014) ("HAVA does not contain language that requires that the provisional votes be counted; it is directed to providing provisional votes."); *see also Hood*, 342 F. Supp. 2d at 1080 ("HAVA certainly does not require the counting of the vote of . . . one who registers

too late.").

     During oral argument, Isabel argued that Congress couldn't have intended for the HAVA to be interpreted in this manner because, otherwise, state and local officials could disregard valid provisional ballots with impunity. This argument is unpersuasive. First, it's entirely rational to interpret the HAVA as only creating the right to cast a provisional ballot, while leaving it to the states to make the eligibility determination. Isabel's interpretation of the HAVA would create a federal cause of action to challenge a state or local election official's application of state law whenever a provisional ballot has been cast. If Congress had intended to effectuate such an enormous shift in the balance of power related to elections, it presumably would have said so explicitly. *United States v. Bass*, 404 U.S. 336, 349 (1971) ("[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance."). The HAVA's statutory language, moreover, raises the opposite inference—it states the "appropriate State or local election official" is the one who "determines that the individual is eligible under State law to vote."

     Second, the bogeyman conjured by Isabel—that state and local officials can simply disregard valid provisional ballots—doesn't exist. An aggrieved voter may still challenge the failure to count provisional ballots under state law. *See, e.g., State ex rel. Skaggs v. Brunner*, 900 N.E.2d 982, 988-89 (Ohio 2008) (The Help America Vote Act . . . authorizes the states to determine 'whether a provisional ballot will be counted as a valid ballot' . . . . This case involves the validity of three categories of provisional ballots cast at the November 4 general election in Franklin County . . . . Relators, two Franklin County voters, request that all three categories of disputed provisional ballots be deemed invalid and not be counted. [The Secretary of State and others] request that the court hold that all three categories be ruled valid and be counted. Respondent Franklin County Board of Elections defers to the secretary of state's position because of her tie-breaking decisions on the disputed provisional ballots. We address the three categories of provisional ballots in order.").

Third, this outcome isn't inconsistent with the HAVA's administrative framework, as Isabel suggested during oral argument.  The HAVA requires a state receiving certain funding "to establish and maintain State-based administrative complaint procedures."  52 U.S.C. § 21112(a)(1).  The procedures must allow "any person who believes that there is a violation of any provision of subchapter III"—and the provision at issue here, 52 U.S.C. 21082(a)(4), falls within subchapter III of the statute—to file an administrative complaint.  See 52 U.S.C. § 21112(a)(2)(B).  The presence of this parallel framework doesn't say anything about whether Congress wanted to allow voters to challenge state-law eligibility determinations in federal court.  If anything, it cuts against interpreting the HAVA as creating an expansive federal cause of action.  *Cf. Am. Civil Rights Union v. Philadelphia City Comm'rs*, 872 F.3d 175, 184-85 (3d Cir. 2017) (identifying the HAVA's "administrative complaint" process as evidence of "Congress's intent to limit HAVA's enforcement mechanism").

Finally, Isabel stated during oral argument that *Sandusky* demonstrates federal courts can and should evaluate state-law voter eligibility determinations under the HAVA.  The Court respectfully disagrees.   In Section VI of the *Sandusky* opinion, the Sixth Circuit reversed the portion of the district court's order that required state election officials to count certain provisional ballots.  387 F.3d at 576 ("[T]he district court also held that provisional ballots must be counted as valid ballots when cast in the correct county.  We disagree.").  In reaching this conclusion, the Sixth Circuit emphasized that the HAVA "explicitly defers determination of whether ballots are to be counted to the States" and cited legislative history materials suggesting that "[n]othing [in the HAVA] usurps the state or local election official's *sole authority* to make the final determination with respect to . . .whether that vote is duly counted."  *Id.* at 578 (emphasis added and citation omitted).

### D.    The Qualifications Clause

Count 3 of the complaint alleges that Defendants violated Article I, Section 2, clause 1 of the United States Constitution by failing to count Isabel's ballot even though he was a qualified voter.  (Doc. 1 ¶¶ 66-71.)

As an initial matter, the Court notes that the description of the Qualifications Clause[8] contained in Isabel's complaint—he characterizes it as "secur[ing] the right of qualified voters within a state to cast their ballots and have them counted in Congressional elections" (Doc. 1 at 14 ¶ 68)—is at odds with the actual text of that provision.  The Qualifications Clause provides: "The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature."

The best reading of the Qualifications Clause is that it simply ensures that a voter who is qualified to vote in an election for the most numerous branch of the state legislature (in Arizona, as in most states, the House of Representatives) must also be permitted to vote for candidates for the United States House of Representatives.  Many other courts have interpreted it in this fashion.  *See, e.g., Tashjian*, 479 U.S. at 229 ("The fundamental purpose of the Qualifications Clause[] . . . is satisfied if all those qualified to participate in the selection of members of the more numerous branch of the state legislature are also qualified to participate in the election of . . . Members of the House of Representatives."); *Cool Moose Party v. State of R.I.*, 6 F. Supp. 2d 116, 122-24 (D.R.I. 1998) (emphasizing that "[t]he purpose of the Qualifications Clause is to prevent voters who are eligible to vote in state elections from being disqualified from participating in federal elections" and rejecting voter's lawsuit under the Qualifications Clause because the challenged voting practice "does not establish different qualifications for voting for state and federal offices" and "applies equally to all offices, state and federal'); *see also The Ku Klux Cases*, 110 U.S. 651, 663 (1884) ("[The states] define who are to vote for the popular branch of their own legislature, and the [Qualifications Clause of the] constitution of the United States says the same persons shall vote for members of congress in that state.  It adopts the qualification thus furnished as the qualification of its own electors for members of

---

[8]     In *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208 (1986), the Supreme Court referred to Article I, Section 2, clause 1 of the Constitution as the "Qualifications Clause." *Id.* at 225.

congress.").[9]  This, standing alone, dooms Count 3 of Isabel's complaint.  The Secretary couldn't have violated the Qualifications Clause here because she determined Isabel to be unqualified to participate in the elections for *both* the Arizona House of Representatives *and* the U.S. House of Representatives.

The parties ignore this issue in their moving papers.  Rather than address the actual text of the Qualifications Clause, the parties engage in an extensive debate over whether the Secretary's actions "disenfranchised" Isabel.  The Secretary contends that Isabel "fails to state a claim, because voter registration deadlines do not disenfranchise voters from an opportunity to vote, they merely set forth a deadline by which voters must act in order to cast a vote."  (Doc. 33 at 10.)  In support of this contention, the Secretary cites *Rosario v. Rockefeller*, 410 U.S. 752 (1973), and *Barilla v. Ervin*, 886 F.2d 1514, 1525 (9th Cir. 1989), *overruled on other grounds by Simpson v. Lear Astronics Corp.*, 77 F.3d 1170, 1174 (9th Cir. 1996), in which the Supreme Court and Ninth Circuit, respectively, held that voter registration deadlines did not unconstitutionally burden the right to vote.  (Doc. 33 at 11-12.)  Isabel, in response, explains that he "does not contend that voter registration deadlines, in and of themselves, disenfranchise voters.  Rather, [Isabel] simply contends that *he* was disenfranchised . . . .  In other words, [Isabel's] ballot would have counted, but for the Defendants' unlawful conduct."  (Doc. 37 at 10-11.)  Additionally, Isabel attacks the cases cited by the Secretary—*Rosario* and *Barilla*—as inapposite.  He argues those cases "do not stand for the proposition that *improperly* set voter registration deadlines cannot disenfranchise or harm a voter."  (*Id.* at 14.)

Although it is unnecessary to resolve this dispute here—Isabel's Qualifications

---

[9]  Following oral argument, Isabel submitted a notice (Doc. 52) that identified *United States v. Classic*, 313 U.S. 299 (1941), as a decision supporting his interpretation of the Qualifications Clause.  Although *Classic* does contain some dicta that may support Isabel's position, the issue in that case was simply whether the Qualifications Clause applied in primary elections, such that certain state election officials who had "willfully altered and falsely counted and certified the ballots of voters cast in the primary election" could be prosecuted for federal crimes.  *Id.* at 307.  The Supreme Court's subsequent ruling in *Tashjian*, which recognizes that the "fundamental purpose" of the Qualifications Clause is to ensure that voters be treated equally when voting in dual federal/state elections, is more instructive.

Clause claim would fail regardless of who is correct—the Court agrees with the Secretary. Even if the Secretary violated state and/or federal law when setting the registration deadline, Isabel had ample opportunity to register to vote and therefore wasn't disenfranchised. *Rosario* and *Barilla* are controlling.

In *Rosario*, the Supreme Court upheld a New York law requiring a person to enroll with a political party at least 30 days before the general election in order to vote in that party's primary for the following election. 410 U.S. at 754. In effect, "[t]he cutoff date for enrollment [was] approximately eight months prior to a presidential primary (held in June) and 11 months prior to a nonpresidential primary (held in September)." *Id.* at 760. The plaintiffs in *Rosario* didn't enroll with a political party by the deadline and thus couldn't participate in the primary. *Id.* at 755. The Supreme Court held the challenged statute "did not absolutely disenfranchise the class to which the petitioners belong" but "merely imposed a time deadline on their enrollment, which they had to meet in order to participate in the next primary." *Id.* at 757. The Supreme Court further explained that, to the extent the plaintiffs' "plight can be characterized as disenfranchisement at all, it was not caused by [the challenged deadline], but by their own failure to take timely steps to effect their enrollment." *Id.* at 758. The Supreme Court concluded that New York had not placed an unconstitutionally onerous burden on the plaintiffs' exercise of the franchise— instead, New York "merely imposed a legitimate time limitation on their enrollment, which they chose to disregard." *Id.* at 760-62.

In *Barilla*, the Ninth Circuit upheld an Oregon statute requiring those wanting to vote in a general election to register at least twenty days before the election. 886 F.2d at 1517, 1524-25. The plaintiffs challenged the statute because they failed to register in time. *Id.* at 1517. The Ninth Circuit upheld the statute, relying in part on *Rosario* to support the conclusion that the plaintiffs "were all disenfranchised by their willful or negligent failure to register on time," not by the registration deadline. *Id.* at 1525. The court explained the plaintiffs "could have registered in time . . . but they failed to do so," and thus the registration deadline was "not a 'ban' on the plaintiffs' right to vote but rather a 'time

'limitation' on when the plaintiffs had to act in order to be able to vote." *Id.*

The rationale underlying *Rosario* and *Barilla* is equally applicable here. The facts, as alleged by Isabel, show that the Secretary publicly set a voter registration deadline of October 10, 2016 and "adopted a policy that deemed invalid any ballot cast in the November 2016 Election by a voter who registered on October 11, 2016." (Doc. 1 ¶¶ 19, 22.) Isabel doesn't allege that the Secretary clandestinely set October 10 as the registration cut-off date. Nor does he allege he was unaware of the deadline or that it was impossible for him to register by October 10. Thus, Isabel's inability to vote was caused "by [his] own failure to take timely steps to effect [his] enrollment." *Rosario*, 410 U.S. at 758.

Isabel argues *Rosario* and *Barilla* "do not stand for the proposition that *improperly* set voter registration deadlines cannot disenfranchise or harm a voter." (Doc. 38 at 14.) True. In those cases, the plaintiffs didn't challenge the propriety of the voter registration deadlines under state or federal law. Yet even assuming the Secretary violated state and federal law when setting the October 10 deadline, that has no bearing on whether she violated the *Constitution* (particularly where the only constitutional provision invoked by Isabel merely requires voters to be treated equally for purposes of concurrent state and federal elections).

III. <u>Leave To Amend</u>

At oral argument, Isabel stated that, if the Court were inclined to dismiss his three causes of action against the Secretary, he would request leave to file an amended complaint adding a new federal common law cause of action.

The Court will authorize Isabel to file a motion requesting leave to amend, which Defendants[10] may then evaluate and determine whether to oppose. *See* Fed. R. Civ. P. 15(a)(2). The Court notes, however, that to the extent Isabel's new federal common law cause of action is based on his disenfranchisement theory, the Court would likely be

---

[10] Because the County Defendants only challenged the Court's subject matter jurisdiction and didn't join in the Secretary's motion to dismiss under Rule 12(b)(6), Counts 1-3 in the complaint remain pending against the County Defendants. The Court presumes, however, that a 12(b)(6) motion from the County Defendants will be coming soon. The parties may wish to meet and confer to avoid unnecessary motions practice.

inclined to deny leave to amend as futile for the reasons discussed above. *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041 (9th Cir. 2011) ("Although leave to amend should be given freely, a district court may dismiss without leave where a plaintiff's proposed amendments would fail to cure the pleading deficiencies and amendment would be futile.") (citation omitted).

Accordingly, **IT IS ORDERED** that:

(1)    The County Defendants' motion to dismiss for lack of jurisdiction (Doc. 32) is **denied**; and

(2)    The Secretary's motion to dismiss for failure to state a claim (Doc. 33) is **granted**; and

(3)    By June 28, 2019, Isabel may file a motion for leave to amend his complaint to add a federal common law cause of action.

Dated this 7th day of June, 2019.

Dominic W. Lanza
United States District Judge