**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| David Isabel,<br><br>  Plaintiff,<br><br>v.<br><br>Michele Reagan, et al.,<br><br>  Defendants. | No. CV-18-03217-PHX-DWL<br><br>**ORDER** |

Pending before the Court is a motion to dismiss Plaintiff David Isabel's first amended complaint ("FAC"). (Doc. 61.) The motion was filed by Defendant Michele Reagan and joined by Defendants Maricopa County and Maricopa County Recorder Adrian Fontes. For the following reasons, the motion will be granted and this action will be terminated.

## BACKGROUND

On October 9, 2018, Isabel filed the initial complaint in this case. (Doc. 1.) It alleged that Arizona's Secretary of State in 2016, Michele Reagan ("the Secretary"), established Monday, October 10, 2016 as the voter registration deadline for the 2016 general election ("the 2016 Election"). (*Id.* ¶ 19.) October 10 was also Columbus Day, a state and federal holiday, and therefore certain methods of registration weren't available on that day. (*Id.* ¶¶ 15-17.)

Isabel registered to vote on October 11, 2016. (*Id.* ¶ 24.) Because this was one day after the voter registration deadline that had been set by the Secretary, Isabel was only

permitted to cast a provisional ballot during the 2016 Election. (*Id.* ¶ 35.) Officials in the Maricopa County Recorder's Office ultimately determined that Isabel wasn't an eligible voter, due to his failure to register by the October 10 deadline, and thus didn't count his vote. (*Id.* ¶¶ 36-38.)

In the complaint, which Isabel filed on behalf of a class of similarly-situated individuals, Isabel alleged that Defendants violated two federal statutes—(1) the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20501 *et seq.*, and (2) the Help America Vote Act of 2002 ("HAVA"), 52 U.S.C. § 21081 *et seq.*—as well as Article I, Section 2 of the United States Constitution ("the Qualifications Clause"). (*Id.* ¶¶ 53-71.) All three claims were asserted via 42 U.S.C. § 1983. (*Id.* at 11-15.) As a remedy, Isabel sought "compensatory and punitive damages," among other things. (*Id.* at 15.)

On June 7, 2019, the Court dismissed all three claims without prejudice.[1] (Doc. 54.) First, the Court dismissed the NVRA claim because the NVRA contains its own remedial scheme, which (unlike § 1983) authorizes only declaratory and injunctive relief, and Congress intended those limited remedies to be exclusive. (*Id.* at 9-14.) Second, the Court dismissed the HAVA claim because that statute only creates a federal right to cast a provisional ballot and to have the ballot be counted "if the appropriate election official 'determines' that the individual is eligible"—it doesn't go further and create a federal right to challenge the propriety of state-law eligibility determinations. (*Id.* at 15-18.) Third, the Court dismissed the Qualifications Clause claim because that provision prohibits states from establishing different qualifications for voting for state and federal offices (and Isabel's ballot was treated equally—that is, disregarded—for all of the contested races in the 2016 Election) and because Isabel hadn't, in any event, alleged facts showing that the registration deadline had disenfranchised him. (*Id.* at 18-22.)

On June 27, 2019, Isabel filed the FAC. (Doc. 60.) The FAC does not contain any new factual allegations and does not assert any alternative theories concerning Count I of

---

[1] The Court dismissed the initial complaint only against the Secretary because the County Defendants didn't move for dismissal on 12(b)(6) grounds. (Doc. 54 at 22 n.10.)

the original complaint (the NVRA-based § 1983 claim), but it does seek to refine Count II (the HAVA-based § 1983 claim) and Count III (the constitutionally-based § 1983 claim).[2] Specifically, with respect to Count II, the FAC alleges that section 304 of the "HAVA expressly precludes [voter registration] determinations based on 'State requirements [that are] inconsistent with the [NVRA].'" (Doc. 60 ¶ 62.) The FAC thus asserts that, because the October 10 voter registration deadline was inconsistent with the NVRA, Defendants necessarily also violated the HAVA. (*Id.* ¶¶ 63, 64.) With respect to Count III, the FAC no longer relies solely on the Qualifications Clause and instead broadly invokes the Constitution as providing the foundation for the claim. (*Id.* ¶¶ 69-73.)[3]

On July 5, 2019, the Secretary moved to dismiss the FAC. (Doc. 61.) On July 8, 2019, the County Defendants joined this motion. (Doc. 63.)

On September 30, 2019, the Court issued a tentative ruling and authorized the parties to submit supplemental briefing. (Doc. 71.)

On October 24, 2019, after the parties submitted their supplemental briefs (Docs. 73, 75, 76), the Court held oral argument. (Doc. 78.)

**LEGAL STANDARD**

"[T]o survive a motion to dismiss, a party must allege 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual

---

[2] *See* Doc. 65 at 2 (Isabel's response to motion to dismiss: "The FAC contains three substantive amendments: (i) it addresses the Court's interpretation of HAVA by alleging an alternative violation; (ii) clarifies that Count III of the Complaint encompasses Mr. Isabel's claim that § 1983 codifies the common-law cause of action for deprivation of the fundamental right to vote, long established by the Supreme Court; and (iii) limits the claims for punitive damages to Defendant Reagan.").

[3] *See also* Doc. 55-1 at 14 (redlined version of FAC, showing that Count III of the original complaint was premised on an alleged violation of "Article I, Section 2 of U.S. Constitution" and that the FAC amended this count by eliminating the reference to Article I, Section 2 and replacing it with a reference to "the Right to Vote Secured by the U.S. Constitution"); Doc. 65 at 7 (Isabel's response to motion to dismiss: "Although Article I, Section 2 of the Constitution still remains a basis for his Third Cause of Action, the FAC emphasizes that Article I, Section 2 is no longer the sole basis for his alleged constitutional deprivation.").

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678). "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1144-45 (citation omitted). However, the court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 679-80. The court also may dismiss due to "a lack of a cognizable legal theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

**DISCUSSION**

I.  HAVA

Isabel attempts to resuscitate his HAVA-based claim by arguing that (1) section 304 of that statute (which is codified at 52 U.S.C. § 21084) prohibits a state from making voter-eligibility determinations that are inconsistent with the NVRA, and (2) Defendants committed an NVRA violation here.

This argument is unavailing. The starting point for the analysis is, of course, the statutory text. Section 304 of the HAVA, which is entitled "Minimum requirements," provides as follows:

> The requirements established by this subchapter are minimum requirements and nothing in this subchapter shall be construed to prevent a State from establishing election technology and administration requirements that are more strict than the requirements established under this subchapter so long as such State requirements are not inconsistent with the Federal requirements under this subchapter or any law described in section 21145 of this title [which includes the NVRA].

52 U.S.C. § 21084.

This language does not, as Isabel contends, incorporate all of the NVRA's substantive requirements, such that a violation of the NVRA is automatically a violation of the HAVA. To the contrary, section 304 applies only when (1) a particular portion of the HAVA ("this subchapter," *i.e.,* subchapter III of the HAVA, which encompasses 52 U.S.C. §§ 21081-85 and 21101-02) establishes a particular type of requirement (an "election technology and administration requirement"); (2) a state chooses to establish "such" a requirement that is "more strict" than the one established under subchapter III of the

- 4 -

HAVA; and (3) the state requirement violates the NVRA or another one of the cross-referenced statutes mentioned in 52 U.S.C. § 21145.

Section 304 doesn't help Isabel's case because subchapter III of the HAVA doesn't purport to establish voter registration deadlines. To the contrary, to the extent subchapter III of the HAVA addresses this topic at all, it leaves the choice to the states. *See* 52 U.S.C § 21082(a) ("States . . . may meet the requirements of this subsection [governing provisional voting requirements] using voter registration procedures established under applicable State law."). *See generally Florida State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1170 (11th Cir. 2008) ("HAVA section 302(a) describes general procedures for casting and reviewing provisional ballots; it does not impose any federal standards on voter registration or voter eligibility, both of which remain state decisions."). Thus, a voter registration deadline established by Arizona, or any other state, cannot be described as an "election technology and administration requirement[] that [is] more strict than the requirements established under this subchapter." *See* 52 U.S.C. § 21084.

This conclusion is not only compelled by the plain language of the statute, which should end the analysis, but is also necessary to avoid absurd results. As noted in the order dismissing the earlier iteration of Isabel's complaint, "[t]he NVRA requires a party to give notice of a violation before bringing a civil action if the federal election is more than 30 days away" and "only allows declaratory and injunctive relief." (Doc. 54 at 14.) But Isabel's interpretation of section 304 would allow him to circumvent the limited remedies Congress chose to create for violations of the NVRA and ignores the "assumption . . . that limitations upon the remedy contained in the statute are deliberate." *City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113, 124 (2005). It would be illogical to assume that Congress chose to jettison the carefully-calibrated remedial scheme contained in the NVRA (which doesn't authorize money damages) via a fleeting cross-reference to the NVRA in a "minimum requirements" provision of a different statute. *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it

does not, one might say, hide elephants in mouseholes.").

Finally, one additional reason why Count II of the FAC may fail is that it's unclear whether Congress intended for § 1983 to serve as a vehicle for asserting claims for money damages premised on violations of section 304 of the HAVA. (This is an issue the Secretary didn't raise in her motion to dismiss the initial complaint but now raises in her motion to dismiss the FAC, *see* Doc. 61 at 5.) Nevertheless, given the conclusions set forth above, the Court need not resolve this issue here.

II. "The Right To Vote"

The FAC frames Count III as asserting a violation of "the right to vote," rather than merely a violation of the Qualifications Clause. (Doc. 55-1 at 14; Doc. 60 ¶¶ 67-73.) According to Isabel, this right arises from "federal common law" and has been "long established in the Supreme Court's jurisprudence." (Doc. 65 at 4.) Isabel further argues this right necessarily encompasses "the right of qualified voters within a state to cast their ballots and have them counted at Congressional elections." (*Id.* at 8, citation omitted.)

The FAC also alleges that Isabel was, in fact, eligible to vote under Arizona law. (Doc. 60 ¶ 71 ["[A]ll of the provisional ballots described herein were cast by qualified voters within the State of Arizona . . . ."].) In support of this allegation, the FAC alleges that the voter registration deadline chosen by the Secretary fell on Columbus Day, which is a "state and federal holiday." (*Id.* ¶¶ 15-16.) And in his opposition to the motion to dismiss the FAC, Isabel identifies an Arizona state statute that provides that "[w]hen anything of a secular nature . . . is provided or agreed to be done upon a day . . . and the day . . . falls on a holiday, it may be performed on the next ensuing business day with effect as though performed on the appointed day." *See* A.R.S. § 1-303. Isabel thus contends that "all registrations submitted on October 11, 2016 were, as a matter of law, filed on October 10, 2016" and that the facts alleged in the FAC therefore "[d]emonstrate that [Isabel] [w]as a [q]ualified Arizona [v]oter on November 8, 2016." (Doc. 65 at 4-5, citing A.R.S. § 1-303 and Ariz. Att. Gen. Op. No 58-74.)

Defendants disagree with Isabel's interpretation of state law, albeit for different

reasons. According to the County Defendants, Isabel's reliance on A.R.S. § 1-303 is misplaced because a different provision of Arizona law (A.R.S. § 11-413) gives Arizona counties the option to designate the day after Thanksgiving as a holiday in place of Columbus Day and Maricopa County made such a designation in 2011. (Doc. 73.) Thus, the County Defendants argue, "Maricopa County no longer recognizes Columbus Day as a legal holiday" and Isabel "could have gone, in person, to any Maricopa County office where someone could register to vote on October 10, 2016." (*Id.* at 2.) The Secretary, meanwhile, argues that Isabel's reliance on A.R.S. § 1-303 is misplaced because it doesn't apply to a deadline (such as the voter registration deadline at issue here) that must, by law, precede an election by a set number of days. In support of this argument, which was raised for the first time during oral argument, the Secretary cites *Fisher v. City of Apache Junction*, 28 P.3d 946 (Ariz. Ct. App. 2001).

The Court concludes it is unnecessary to decide which party's interpretation of state law is correct and will thus decline to resolve the issue. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."). As discussed below, even assuming for the sake of argument that Isabel's interpretation of Arizona law is correct, and that he therefore should have been deemed eligible under state law to vote in the 2016 Election, he still has not stated a cognizable claim under § 1983.

At bottom, Isabel's theory is that the right to vote is a fundamental right protected by the Constitution, so if a state official fails to count a qualified voter's ballot during a federal election, it follows that the official may be sued for money damages under § 1983. (Doc. 76 at 3 ["The constitutional right at issue in [Count III] is the right of qualified electors to vote in federal elections. It is beyond dispute that this is a *fundamental* right expressly protected by the Constitution."].) The FAC identifies *United States v. Classic*, 313 U.S. 299 (1941), as the case that provides the most direct support for this theory. (Doc. 60 ¶ 69.) Additionally, in his supplemental brief, Isabel argues that "[c]ourts have

consistently upheld the right to seek compensatory damages for the violation of the right to vote" and cites four cases—*Nixon v. Herndon*, 273 U.S. 536 (1927), *Taylor v. Howe*, 225 F.3d 993 (8th Cir. 2000), *Wayne v. Venable*, 260 F. 64 (8th Cir. 1919), and *United States v. Mosley*, 238 U.S. 383 (1915)—as further proof that he has "alleged a cognizable legal theory *and* a vehicle for pursuing a money-damages claim against Defendants under federal law." (Doc. 76 at 7-8.)

Isabel's argument has undeniable surface appeal. The Supreme Court has described the right to vote as "precious" and "fundamental"[4] and "preservative of all rights"[5]—sentiments with which this Court wholeheartedly agrees. Nevertheless, it doesn't follow that a state election official may be sued for money damages under § 1983 for making an incorrect determination concerning an individual voter's eligibility.

As an initial matter, *Classic* does not compel acceptance of Isabel's theory. In *Classic*, individuals who were qualified to vote under state law had their ballots "willfully altered and falsely counted" by corrupt local election officials. 313 U.S. at 307. Specifically, "[t]he overt acts alleged were that the [officials] altered eighty-three ballots cast for one candidate and fourteen cast for another, marking and counting them as votes for a third candidate, and that they falsely certified the number of votes cast for the respective candidates to the chairman of the Second Congressional District Committee." *Id.* at 308. Based on these facts, the Supreme Court concluded the election officials could be prosecuted for violating federal criminal law. *Id.* at 325-26.

To be sure, *Classic* contains a number of passages that, when read in isolation, can be construed as suggesting that a federal constitutional violation occurs whenever a state election official fails to count a ballot cast by a qualified voter. If this were the rule, then Count III of the FAC might survive dismissal. But the Court is not persuaded that this is, in fact, the rule. *Classic* was a criminal case involving the willful and intentional alteration of ballots cast by voters whose eligibility to vote under state law was undisputed. This is

---

[4] *Harper v. Virginia State Bd. of Elec.*, 383 U.S. 663, 670 (1966).
[5] *Reynolds v. Sims*, 377 U.S. 533, 562 (1964) (citation omitted).

a civil case in which Isabel has identified various legal reasons why he should have been considered eligible to vote under state and/or federal law despite his failure to register until one day after the ostensible registration deadline. If it were possible to sue state election officials for money damages under § 1983 under these circumstances, there presumably would be some precedent for doing so.

In fact, there are several post-*Classic* cases that strongly suggest § 1983 does not provide a remedy under these circumstances. In *Powell v. Power*, 436 F.2d 84 (2d Cir. 1970), a group of voters "in a Congressional primary election" brought a § 1983 action against "state election officials [for] permitting a number of individuals to cast ballots who under state law were not qualified to vote." *Id.* at 85. Among other things, the voters argued—just like Isabel argues here—that the officials' conduct violated Article I, Section 2 of the Constitution and that § 1983 authorizes "federal courts to remedy errors in the election process." *Id.* at 88. The Second Circuit, after noting that these claims did "not require extended consideration," held that "[A]rticle I, [S]ection 2 offer[s] no guarantee against errors in the administration of an election" and that "while [A]rticle I, [S]ection 2 may outlaw purposeful tampering by state officials . . . we cannot believe that the framers of our Constitution were so hypersensitive to ordinary human frailties as to lay down an unrealistic requirement that elections be free of any error." *Id.* (citing *Classic*, 313 U.S. at 299). The *Powell* court further noted that, "[w]ere we to embrace plaintiffs' theory, this court would henceforth be thrust into the details of virtually every election, tinkering with the state's election machinery, reviewing petitions, registration cards, vote tallies, and certificates of election for all manner of error and insufficiency under state and federal law." *Id.* at 86. *Powell*, in other words, construed *Classic* as exposing state election officials to liability for violating the Constitution only for "purposeful tampering" with ballots—conduct that isn't alleged here—and held that state election officials otherwise can't be sued under § 1983 for making erroneous voter-eligibility determinations.[6]

Similarly, in *Hutchinson v. Miller*, 797 F.2d 1279 (4th Cir. 1986), an unsuccessful

---

[6] Although *Powell* is a Second Circuit decision, and thus not binding here, the Ninth Circuit has cited *Powell* with approval as a case involving a "'garden variety' election

- 9 -

candidate for federal office brought a money-damages action under § 1983 against a host of state and local election officials, alleging that the officials had conspired to disregard certain votes that had been cast in his favor. *Id.* at 1280-81. In holding the claim was not cognizable, the Fourth Circuit emphasized that "[e]lections are, regrettably, not always free from error," noted that some common errors include "registrars [who] fail to follow instructions" and "absentee ballots [that] are improperly administered," and acknowledged that "serious problems of federalism and separation of powers" would arise if federal courts were to authorize money-damages liability under such circumstances. *Id.* at 1286-87.[7]

The upshot of these decisions is that, although the right to vote is a fundamental right under federal law, that right doesn't entitle a voter to sue a state election official for money damages under § 1983 for incorrectly rejecting (or counting) a particular ballot or for incorrectly rejecting (or accepting) a particular voter's registration application. This is true even if the election official may have violated state law when making the challenged determination. A contrary approach would threaten to enmesh the federal courts in disputes arising from virtually every election and would pose significant federalism concerns.

Indeed, during oral argument, the Court attempted to explore the ramifications of Isabel's liability theory by bringing up the "hanging chads" from Florida that famously entered the nation's consciousness during the 2000 presidential election. *See generally Weber v. Shelley*, 347 F.3d 1101, 1106 (9th Cir. 2003) ("Traditional paper ballots, as became evident during the 2000 presidential election, are prone to overvotes, undervotes, 'hanging chads,' and other mechanical and human errors that may thwart voter intent."). Specifically, the Court asked whether, under Isabel's theory, it would have been permissible for a Florida voter whose ballot was disallowed during the 2000 election to

---

irregularit[y]" that did not rise to the level of a federal constitutional violation. *Bennett v. Yoshina*, 140 F.3d 1218, 1226 (9th Cir. 1998).

[7] *Hutchinson* was cited with general approval by the Ninth Circuit in *Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176 (9th Cir. 1988). Specifically, although the *Soules* court declined to adopt a blanket rule precluding post-election challenges by unsuccessful candidates, it "endorse[d]" the Fourth Circuit's "restrained approach to election challenges." *Id.* at 1182-83.

bring a § 1983 action for money damages against a Florida election official by arguing that (1) the election official misapplied Florida law on hanging chads when making the invalidity determination and (2) by doing so, the official infringed the voter's "right to vote" under the Constitution. In response, Isabel stated that liability would potentially be available under those facts. In the Court's view, this answer underscores the federalism problems that would arise from accepting Isabel's theory.

With that said, it must be acknowledged that Isabel isn't claiming Defendants simply made a mistake when determining he was ineligible to vote—the FAC alleges that Defendants acted with a culpable mindset. (Doc. 60 ¶ 72.) Nevertheless, there are three reasons why the presence of this allegation doesn't change the outcome here.

First, *Powell* and *Hutchinson* both suggest that § 1983 liability wouldn't be available under the facts of this case. Although *Powell* involved innocent mistakes by election officials, the Second Circuit seemed to suggest that liability would arise only in the case of "purposeful tampering" with ballots (which was present in *Classic* but isn't present here), and *Hutchinson* involved allegations of intentional misconduct by the election officials yet the Fourth Circuit didn't allow the case to proceed.

Second, although Count III of the FAC asserts that Defendants acted with "evil motive or intent" or "reckless, callous, and deliberate indifference to [Isabel's] federally protected rights" (Doc. 60 ¶ 72), the Court is not required to accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 679-80. The only facts alleged in the FAC that might support these allegations appear at paragraphs 28-34. The Court has carefully examined those paragraphs and is skeptical they "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

For example, paragraphs 28-30 allege that, on November 3, 2016, a judge in a different lawsuit issued an order that "established that the October 10, 2016 deadline violated federal and state law" and that Defendants flouted this order when they subsequently decided to disregard Isabel's ballot and certify the election results. But in the

order at issue,[8] the judge *denied* a request for an injunction to require the Secretary to count provisional ballots cast by voters (like Isabel) who had registered on October 11, 2016, concluding that such relief was unwarranted because "polling lists have been disseminated, early ballots have been cast, and polls open in a matter of days" and that requiring the Secretary to change course at such a late date would run the risk of "endangering the exercise of that right [to vote] by others." *Arizona Democratic Party v. Reagan*, 2016 WL 6523427, *4, *18 (D. Ariz. 2016). Notably, the order also rejected, on the merits, the plaintiffs' argument "that the Secretary's refusal to extend the October 10, 2016 voter registration holiday deadline impermissibly burdened constitutional rights," holding that the Secretary's decision to "adher[e] to the voter registration deadline served (and serves) the State's important interests in protecting the integrity and reliability of the electoral process itself," that "if the State had extended the voter registration deadline last minute in the days leading up to October 10th, or retroactively set an October 11th voter registration deadline now, [there is] a realistic possibility that the public's confidence in the state's ability to competently administer elections and protect against disorder would be undermined and dissuade them from going to the ballot box next week," and that "the Secretary has demonstrated that the decision not to extend the voter registration deadline in the weeks shortly before the deadline served (and serves) the State's important interests in the orderly, accurate, and reliable administration of elections." *Id.* at *8-12. The order thus concluded that "[t]he Secretary's decision not to extend the deadline in the final hours was a reasonable, non-discriminatory restriction that advanced an important state interest in administering a fair and orderly election. Therefore, the [plaintiffs'] constitutional claim

---

[8] The Court may consider the contents of the order when ruling on Defendants' motion to dismiss, even though the order wasn't attached as an exhibit to the FAC, because (1) the order is subject to judicial notice and (2) the order is referred to in the FAC. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("A court may . . . consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment."); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) ("[Courts] may take judicial notice of court filings and other matters of public record.") (citation omitted).

- 12 -

fails on the merits . . . ." *Id.* at *12.

To be sure, the order in that case also concluded, as a retrospective matter, that the Secretary had violated the NVRA and state law by setting October 10, 2016 as the registration deadline. *Id.* at *14-16. Nevertheless, the overarching point is that the order concluded that the Secretary wasn't required to count provisional ballots cast by voters who had registered on October 11, that the Secretary had legitimate reasons for declining to extend the registration deadline or count such ballots, and that the Secretary's conduct was constitutional. Given those conclusions, it is difficult to understand how Defendants' conduct in the weeks following the issuance of the order could be viewed as proof of "evil motive or intent." *Cf. Wiley v. Sinkler*, 179 U.S. 58, 66-67 (1900) (suggesting it would be inappropriate to "subject[] election officers to an action for damages for refusing a vote which the statute under which they are appointed forbids them to receive it").

Meanwhile, paragraphs 31-34 allege that, in 2018 (*i.e.,* two years after the conduct at issue in this case), the Secretary helped promulgate a new version of Arizona's election procedures manual, which now recognizes that registration deadlines falling on state or federal holidays must be moved to the following day. But such revisions do not plausibly show that Defendants acted with a culpable mindset during the 2016 election cycle. *Cf. Noble v. McClatchy Newspapers*, 533 F.2d 1081, 1090 (9th Cir.1975) ("It was not error to exclude evidence that McClatchy deleted allegedly anticompetitive provisions in the distributorship contracts after plaintiffs' termination. Plaintiffs argue that 'an inference of guilt or wrongdoing may be drawn' from such evidence; but it is well settled that evidence of subsequent remedial measures is not admissible to prove culpability of prior conduct.").

Third, it is important to note that the order in *Arizona Democratic Party v. Reagan* didn't reach the issue of whether the October 10 deadline should have been extended by one day pursuant to A.R.S. § 1-303. Instead, the order concluded that, because the October 10 deadline was impermissible under the NVRA, it was necessarily impermissible under state law, too. *Reagan*, 2016 WL 6523427 at *16 ("The Court . . . need not determine whether the Secretary was required to extend the deadline here pursuant to § 1-303, because

- 13 -

any application of Ariz. Rev. Stat. § 16-120 that effectively requires that voter registration to be received earlier than 30 days before a federal election is superseded by NVRA."). This is relevant because, as noted in the order dismissing the previous iteration of Isabel's complaint, a plaintiff can't bring an action for money damages under § 1983 premised on a violation of the NVRA. (Doc. 54 at 9-14.) It would be anomalous if Isabel could evade this conclusion by simply repackaging his NVRA claim as a violation of the "right to vote" established by the Constitution.

Finally, the four cases cited in Isabel's supplemental brief do not compel the acceptance of his liability theory. In *Nixon*—which was decided in 1927—a black resident of Texas wasn't allowed to vote in a 1924 primary election due to a Texas statute, enacted in 1923, which provided that "in no event shall a negro be eligible to participate in a Democratic party primary election held in the State of Texas." 273 U.S. at 540 (citation omitted). In response, the plaintiff brought a § 1983 action for money damages against the state election official who had refused to allow him to vote. *Id.* at 539. Notably, the plaintiff didn't allege his constitutional injury was a deprivation of the "right to vote" generally established by the Constitution—instead, he challenged the Texas statute under the provisions of the Fourteenth and Fifteenth Amendments prohibiting race-based discrimination. *Id.* at 540-41. The Supreme Court agreed with his challenge and allowed the lawsuit to proceed, holding that "it is too clear for extended argument that color cannot be made the basis of a statutory classification affecting the right [to vote] set up in this case." *Id.* at 541. *Nixon*, in other words, doesn't hold that a state election official may be sued for violating the "right to vote" whenever the official incorrectly concludes a particular voter is ineligible to vote under state law—it is a race discrimination case.

*Taylor*, similarly, involved a § 1983 claim brought by "16 black citizens of [Arkansas], all registered voters" against county election officials in Arkansas for "discriminating against black citizens on the basis of their race, and intimidating them during the election." 225 F.3d at 1002. Among other things, the election officials were accused of not allowing certain plaintiffs to vote, improperly challenging the ballots cast

by certain other plaintiffs, and engaging in other forms of racial harassment. *Id.* As in *Nixon*, the plaintiffs didn't assert their constitutional injury arose from a violation of the "right to vote"—instead, they relied upon statutes and constitutional provisions that specifically prohibit race-based discrimination. *Id.* at 996 ("The plaintiffs' substantive claims are based on 42 U.S.C. § 1971(a)(1), (a)(2)(A), and (a)(2)(B); the Fourteenth and Fifteenth Amendments to the United States Constitution, and 42 U.S.C. § 1973(a), (b).").

In *Wayne*—which was decided in 1919—a group of local government officials in Arkansas (including judges, candidates for office, and a deputy sheriff in charge of the polls) conspired to steal an election by delaying the opening of the polling facility, slowing the admission of certain voters (by requiring them to enter one by one), expediting the admission of certain voters who had been brought to the polling facility by the defendants' favored candidates, threatening certain individuals with violence, and refusing to admit certain voters when they reached the door of the polling facility. 260 F. at 67-68. The Eighth Circuit held that, under those facts, the defendants could be sued under § 1983 for money damages for violating the plaintiffs' right to vote. *Id.* at 69. Notably, there was no dispute over whether the plaintiffs were eligible to vote under Arkansas law. *Id.* at 67 ("The plaintiffs were qualified electors of Eagle township at the election therein on November 7, 1916, at which election a United States Senator and a member of Congress were lawfully to be voted for and elected.").

Last, in *Mosley*—which was decided in 1915—two Oklahoma election board members were indicted for the federal crime of conspiring to violate the constitutional rights of others. 238 U.S. at 385. Specifically, the officials were charged with entering into a secret agreement not to count the votes from certain precincts and to conceal this misconduct from the third board member. *Id.* at 385-86. Although the Supreme Court observed in passing that it is "unquestionable that the right to have one's vote counted is as open to protection by Congress as the right to put a ballot in a box," *id.* at 386, the only issue before the Court was whether the criminal statute prohibiting civil rights conspiracies should be limited to "conspiracies contemplating violence." *Id.* at 378-88. The Court

concluded the statute should not be construed in this narrow fashion and thus reversed the district court's dismissal of the indictment. *Id.*

The bottom line is that, although the Court is troubled by the notion that state election officials might disregard ballots that should have been considered valid under state law and/or the NVRA, Isabel not shown he is entitled to pursue a § 1983 money-damages claim against Defendants, at least under the facts of this case. Congress declined to authorize such a remedy when enacting the NVRA (and again when enacting the HAVA), Isabel hasn't pointed to any decisions—in the nearly eight decades since *Classic* was decided—validating his theory of liability, and the FAC doesn't plausibly allege that Defendants acted with a culpable mindset. Although the Court is "mindful that federal courts have a duty to ensure that national, state and local elections conform to constitutional standards," that duty must be pursued "with a clear-eyed and pragmatic sense of the special dangers of excessive judicial interference with the electoral process." *Soules,* 849 F.2d at 1182-83.[9]

Accordingly, **IT IS ORDERED** that:

(1) Defendants' motion to dismiss the FAC for failure to state a claim (Doc. 61) is **granted**;

(2) Isabel's motion for class certification (Doc. 69) is **denied as moot**; and

(3) The Clerk of Court shall terminate this action and enter judgment accordingly.

Dated this 1st day of November, 2019.

_____
Dominic W. Lanza
United States District Judge

---

[9] Isabel did not request leave to amend in his response to the motion to dismiss the FAC, in his supplemental brief concerning the FAC, or during oral argument and it doesn't appear to the Court that further leave to amend would be necessary or appropriate here.